

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

KMT/NMA
F#: 2020R00304

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 26, 2022

<u>By ECF</u>

The Honorable Sanket J. Bulsara
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:   <u>United States v. Sutton, et al (Simpson, Warren)</u>
              <u>Criminal Docket No. 20-323 (S-2) (AMD)</u>

Dear Judge Bulsara:

      The government respectfully submits this letter in support of the pretrial detention of the defendants Andrew Simpson, also known as "Drew" and "Drewski," and Ronnie Warren, also known as "Horse" and "Bossman Horse." Both defendants are charged by superseding indictment in the above-captioned case with racketeering conspiracy in connection with their membership in a violent gang based in East New York, Brooklyn, known currently as "Bamalife" and formerly as "CBB" or the "Cocky Bama Bullies."[1] Simpson and Warren are additionally charged with conspiring to murder John Doe 1, a Bamalife rival, and Simpson is charged with participating in a gang-related shooting that injured eight people in August 2021. Further, Warren is charged with bank fraud and aggravated identity theft. Simpson's and Warren's membership in the violent Bamalife gang, their participation in acts of violence, and their involvement in various fraudulent schemes make clear that they are each a flight risk and a danger to the community. And finally, this morning, as federal agents attempted to execute the arrest warrant for Simpson, Simpson fled. When Simpson was apprehended, agents found a handgun with an extended ammunition clip on his person. For the reasons set forth below, both defendants should be detained pending trial.

---

    [1]    The gang's current name is derived from the area of East New York in which it operates, i.e., approximately the area bounded by Pennsylvania Avenue to the east, Williams Avenue to the west, Dumont Avenue to the south, and Sutter Avenue to the north, which is known to some as the "Bamas." The name "Bamas," in turn, is derived from Alabama Avenue, which bisects the area.

I. <u>Background</u>

    a. The Second Superseding Indictment and
       <u>Pending Charges against Other Bamalife Members</u>

On April 20, 2022, the grand jury returned a second superseding indictment (the "Superseding Indictment" or "S-2") in the above-captioned case, charging six members of Bamalife with racketeering conspiracy, numerous gang-related shootings, use and discharge of firearms, drug distribution, various fraudulent schemes, and identity theft. With respect to the acts of violence, S-2 charges the members of Bamalife with crimes related to six shootings:

- On August 11, 2019, Sutton, accompanied by others, accosted a member of a rival gang after a party in East New York. Sutton demanded to know if the victim was a member of the rival gang and then began shooting and pursuing the intended victim as the victim attempted to flee. Sutton struck and seriously injured his intended target and also struck an innocent bystander in the leg.

- On April 20, 2020, Sutton ambushed a male victim in the vicinity of 375 Sheffield Avenue in East New York, Brooklyn. Surveillance video shows Sutton approaching the victim undetected from behind, drawing his weapon, firing several shots and striking the victim in the chest, thigh and wrist before fleeing the scene.

- On May 16, 2020, Sutton and Sumpter, together with others, shot and seriously injured a member of a rival gang in the vicinity of 2211 Pitkin Avenue in East New York, Brooklyn. Surveillance video of the shooting shows two cars pulling up to a location approximately four blocks from the shooting. Sutton exited one of the cars and approached 2211 Pitkin Avenue, where members of a rival gang are known to congregate, while Sumpter and other coconspirators waited in the vehicles. Surveillance video from inside the building shows Sutton in the lobby holding a firearm. Moments later, Sutton shot the rival in the courtyard of 2211 Pitkin Avenue, ran back to the waiting vehicles, and fled the scene.

- On July 14, 2020, Sutton, Sumpter, and others opened fire on a member of a rival gang in the vicinity of 620 Vermont Avenue in East New York. Video surveillance footage of the shooting shows Sutton, Sumpter and others arrive at the scene in two cars. Sutton and Sumpter exited one of the vehicles and began shooting, striking the rival gang member and seriously injuring him. Sutton, Sumpter, and several other individuals then ran back to the waiting vehicles, which sped off.

- On February 6, 2021, Sumpter shot at a group of individuals outside a six-year old's birthday party in the vicinity of 1093 Putnam Avenue in Brooklyn, after a member of Bamalife had an altercation with those individuals at the party. Video surveillance footage shows Sumpter outside the entrance to the party as guests, including young children, were leaving. The surveillance footage shows a group of individuals running

2

from the scene and shows Sumpter chasing after them while firing several shots. Following the shooting, Sumpter fled in a waiting vehicle.

- On August 16, 2021, Simpson and at least two accomplices shot into a crowd outside of 927 Dekalb Avenue in Brooklyn, striking eight individuals. Video surveillance of the incident shows Simpson and his accomplices double-park near the scene of the shooting, after which two of the conspirators approached the large crowd gathered in the courtyard and began firing. The shooters returned to the waiting vehicle and sped off.

- As discussed below, S-2 also charges members of Bamalife, including Simpson and Warren, with conspiring to murder and to assault John Doe 1, a member of a rival gang, from 2016 to the present.

In the course of the shootings described in the Superseding Indictment, 12 people were shot, including innocent bystanders to Bamalife's violent and ongoing gang rivalries. As also set forth in S-2, members of Bamalife have engaged in narcotics distribution and various fraudulent schemes in order to make money.

Three Bamalife members are already in federal custody and all three have been detained pending trial. Darrius Sutton, also known as "Darius Sutton" and "Blizz Meecho," was first charged in this district by complaint and arrested on July 29, 2020. (See 20-CR-323 (AMD)). Thereafter, Sutton was charged with various acts of gang-related violence in-aid-of racketeering and associated firearms charges in the first superseding indictment in the above-captioned case. (See id. (S-1)). The previous charges against Sutton are incorporated into S-2 along with new charges, including racketeering conspiracy, violence in-aid-of racketeering and associated firearms charges.

Defendant Tyshawn Sumpter was first charged in this district by complaint and arrested on March 9, 2021, in connection with a shooting outside a child's birthday party, mentioned above, on February 6, 2021. (See 21-CR-159 (SJ)). Sumpter was subsequently charged by superseding indictment with charges related to that shooting and to his participation in unemployment benefits fraud and aggravated identity theft. (See id. (S-1)). The crimes previously alleged against Sumpter are incorporated into S-2 along with new charges, including racketeering conspiracy, violence in-aid-of racketeering and associated firearms charges.

Defendant Corey Williams was first charged in this district by complaint and arrested in the District of South Carolina on August 11, 2021, in connection with his involvement in a bank fraud scheme and associated aggravated identity theft. (See 21-CR-498 (AMD)). Williams was subsequently charged by indictment with those same crimes. (See id.). The crimes previously alleged against Williams are incorporated into S-2 along with new charges, including racketeering conspiracy, conspiracy to murder in-aid-of racketeering, narcotics distribution and use, carrying and possession of a firearm in connection with drug trafficking crimes.

3

      b. Simpson's and Warren's Participation
         in the Affairs of the Bamalife Enterprise

The government's investigation, which has included, among other things, the execution of more than a dozen search warrants, obtaining dozens of surveillance videos, and interviewing multiple cooperating witnesses and civilian witnesses has revealed Simpson's and Warren's participation in the conduct of the Bamalife enterprise's affairs.

      i. Simpson's and Sutton's 2014 Shooting inside 2255 Pitkin Avenue

On February 16, 2014, Simpson, Sutton and another Bamalife member shot and seriously injured an individual inside a deli located at 2255 Pitkin Avenue.[2] The shooting is captured on video, which shows Sutton and Simpson confront the victim inside the deli, while Sutton holds a firearm in his left hand. The video shows Sutton raise his left arm and fire multiple shots, striking the victim several times. Just before shots were fired, a diner in the deli overheard one of the conspirators say, "why don't you kill this motherfucker already."[3]

      ii. Conspiracy to Murder Members of Weez Gang

As set forth in the Superseding Indictment, members of Bamalife, including Simpson, have conspired to kill members of Weez Gang since in or about 2014. Weez Gang is one of Bamalife's principal rivals, and its members and associates live primarily in apartment buildings located along Pitkin Avenue, just outside the area of East New York known as the "Bamas." On January 13, 2016, Bamalife/CBB member Darnell Wilkerson was murdered in broad daylight on a crowded street in Brooklyn. Witnesses have informed the government that members of Bamalife/CBB blamed Weez Gang for Wilkerson's killing and that, following his death, members of Bamalife/CBB, including Simpson, agreed that it was "shoot on sight" for members of Weez Gang, i.e., members of Bamalife/CBB were expected to shoot and attempt to kill Weez Gang members whenever they had the opportunity. Thereafter, as alleged in the Superseding Indictment, members of Bamalife shot and attempted to kill members of Weez Gang on August 11, 2019, May 16, 2020 and July 14, 2020. On August 11, 2019, later the same day as the August 11, 2019 shooting alleged in the Superseding Indictment, Simpson posted to his "drewskidolla" Facebook account a message that read

---

[2]     Simpson and Sutton were 15 and 16, respectively, at the time of this shooting. See United States v. Wong, 40 F.3d 1347, 1367 (2d Cir. 1994) (holding that, once it is established that the defendant continued to participate in the enterprise after his 18th birthday, "the entire case can be tried in accordance with the adult rules of procedure and evidence").

[3]     Although the shooting described in this paragraph is outside the statute of limitations for purposes of a stand-alone charge, the government intends to offer evidence at trial concerning this shooting in connection with Simpson's and Sutton's participation in the racketeering conspiracy charged in Count One of S-2.

4

"GDK Fuck the Blicks & WEEZGANG TO MY DICK."[4] On November 11, 2016, approximately eight months after Wilkerson was killed, Simpson posted to his "drewski.dollas" Facebook account, "Niggas always got Darnell name in they mouth don't worry tho anybody I catch eating the clip. . . ." Based on the context of this post, SIMPSON was threatening to shoot ("eating the clip") those who he perceived to be disrespecting Wilkerson ("Niggas always got Darnell name in they mouth")

iii. Conspiracy to Murder John Doe 1

As alleged in the Superseding Indictment, Simpson and Warren, together with other members of Bamalife, have conspired, beginning at least in November 2016, to murder a specific Weez Gang associate (John Doe 1). Early in the morning on November 23, 2016, John Doe 1's girlfriend was injured in a shooting. John Doe 1 and his associates believed Bamalife members were responsible for the shooting. Indeed, in the days prior to the November 23, 2016 shootings, Simpson made numerous threats over social media against John Doe 1 and his girlfriend. For example, on November 21, 2016, Simpson went "live" on his "drewski.dollas" Facebook account and posted the message "Smoking [nickname for John Doe 1's girlfriend] to the face," along with emojis of a hand with fingers folded to resemble a gun, pointing at a face.

Later on November 23, 2016, Warren was shot in the foot, and Warren informed members of Bamalife that John Doe 1 was responsible for the shooting. Thereafter, Selby, Simpson, Sutton and Williams borrowed a vehicle and went looking for John Doe 1 intending to kill him. The group found John Doe 1 that night and fired several shots at him, but John Doe 1 was not hit. Simpson did not post to his "drewski.dollas" Facebook account from late on the night of November 22, 2016 until late at night on November 24, 2016. When he again began posting on his account, he informed his followers that "Bossman Gucci," i.e., that Warren was ok following the shooting, and moments later he acknowledged that he "Got [his] block hot" along with the following emojis intended to represent gunshots: "💥💥💥💥💥."

The violent dispute between Bamalife and John Doe 1 continued for years after the incident. For example, on November 23, 2019 — the three-year anniversary of the series of shootings described above, Warren posted to his Instagram page "[John Doe 1's girlfriend] & [John Doe 1] GONE DIE 2 GETHA!" Around the same time, Warren released a rap song called "DYING TOGETHER ([John Doe 1] DISS)" together with an an accompanying video in which he and other members of Bamalife can be heard shouting "[John Doe 1's girlfriend] & [John Doe 1] going to die together!" Throughout the video, Warren and other members of Bamalife make the gang-related hand gesture known as "dropping a rake," and in the chorus of the song Warren says, "if you GDK, we slide together / we catch you with 'em, you dying

---

[4] "GDK" means "Gangster Disciple Killer." Weez Gang is associated with the Gangster Disciples and the Folk Nation gang, and therefore the acronym "GDK" and the associated hand gesture known as "dropping a rake" are intended as threats to and provocations of members of the Gangster Disciples, Folk Nation and Weez Gang.

5

together." Similarly, on November 22, 2016, just before the shootings described above, Simpson posted to his "drewski.dollas" Facebook page, "Big GDK Fuck Folks !! . . . Any Relation or Association We Hit em Too" along with the following emojis: "💥 😈".

        iv.   <u>Warren's Participation in Bank Fraud</u>

Bamalife members, including Warren and Williams, have made money through various fraud schemes, including the bank fraud schemes alleged in the Superseding Indictment, which are known as "open ups." The "open up" scheme involves obtaining bank account information for an innocent victim and creating fraudulent checks using that individual's banking information. Warren and Williams coordinated the schemes charged in the Superseding Indictment in 2019 over text messages found on a cellular telephone seized and searched by the government pursuant to a judicially-authorized search warrant. The text messages make clear that Williams and Warren used one or more computers to create fraudulent checks that purported to be from a non-existent entity called "Business Resources Services, Inc." They then deposited the fraudulent checks into accounts belonging to willing conspirators — who, in the "open up" scheme, are generally not members of Bamalife and who have legitimate bank accounts in good standing — in an effort to withdraw money before the bank determined that the checks were fraudulent. As alleged in Count Nine, in the scheme alleged in Count Eight Warren and Williams used "means of identification" belonging to an actual person. The scheme alleged in Count Ten involved account information for a victim corporate entity.

The schemes charged in the Superseding Indictment are not isolated incidents. In the text exchange between Williams and Warren, which spanned from November 2018 to August 2019, the two regularly discussed, conspired, and in fact engaged in fraud. Their text exchange includes dozens of texts related to their frauds, including texts about using Chase account information ("I need to cook up my Chevy," "waiting for this bitch to come so I can get my 3 Chevys"), Bank of America account information ("Bout to pick up my Oa [i.e., BOA]"), and TD Bank account information ("You got td food", "I don't use td"); purchasing supplies for the schemes ("Need paper ain't got no more. . . I need to order . . . . Use[d] my last 10 today . . . Need paper bro use[d] last paper on oa [i.e., BOA] yesterday," "Where can I get check paper from bro I got my own lap top and printer"); the best program to use to create fraudulent checks ("What program to download[?]", "Ez check," "On the lap top?" "Yea"), the withdrawal of fraudulently obtained funds ("How much bread niggas pulled"); and using a computer in furtherance of the scheme ("Send name and addy now bro . . . So I can put it in computer"). In the course of the text exchange, the two exchanged 13 screen shots of bank account information from what appear to be bank smartphone applications; Personal Identifiable Information ("PII") for 10 individuals, including, variously, names, addresses, social security numbers, bank account numbers, and bank usernames and passwords; images of six third-party checks for apparent use in the "open up" scheme described above, including a check drawn on an account belonging to a New York State public school district; and two images of debit cards bearing the names of third parties, among other things. The two also discussed balloons of the synthetic narcotic "K2" that Williams told Warren he intended to smuggle to Tyshawn Sumpter, who was in New York State custody at the time.

6

Items located in Warren's apartment provide further support for his involvement in fraud. This morning, federal agents executed a search warrant at Warren's apartment authorized by the Honorable Michael Hammer, Magistrate Judge for the District of New Jersey. In the course of the search, agents found two laptop computers and eight cellular telephones – in context, these are the tools of the fraud trade.

Simpson is also involved in various forms of fraud. A cellphone seized from Simpson on or about May 26, 2021 and searched pursuant to a judicially-authorized search warrant contains text exchanges related to various fraudulent schemes. For example, in July 2020, Simpson provided a coconspirator with PII for a third-party victim so that the coconspirator could use the information to fraudulently apply for unemployment benefits in Arizona.[5] In February 2021, Simpson sent a text message to which he attached an image that appears to be a picture of a computer screen, which in turn contains information about an individuals' unemployment benefits account. In April 2021, Simpson sent a text message to which he attached an image of the back of a Well Fargo debit card in the name of a third party. And in May 2021, Simpson sent a message to which he attached a screenshot of a cellphone's "lock" screen, showing a "push notification" from the online banking company Chime, noting that "$18,125.00 posted to your account, your balance is $18,125.51." Simpson's social media pages also contain numerous images of him with large stacks of cash, notwithstanding his lack of any lawful employment. Two such images are below:



---

[5] As noted above, Simpson's codefendant Tyshawn Sumpter is charged in the Superseding Indictment with unemployment benefits fraud and associated aggravated identity theft.

      v.   Simpson's Participation in a Shooting in the Vicinity of 927 Dekalb Avenue on August 16, 2021 and his Efforts to Obstruct Justice

As alleged in the Superseding Indictment, on or about August 16, 2021, Simpson and at least two other individuals drove to the vicinity of 927 Dekalb Avenue, in rival gang territory, where two members of the group fired numerous times into a large crowd gathered in the courtyard of several large apartment buildings. Eight people were injured in the shooting. Surveillance video shows that the car used to commit the shooting was rented in the name of the mother of a woman with whom Simpson was involved in a romantic relationship. Further, in a <u>Mirandized</u> post-arrest interview with a detective from the NYPD in January 2022, Simpson was shown a still image taken from surveillance footage of the driver of the rented car used in the shooting, and Simpson identified the individual shown in the image as himself.

In the course of the government's investigation of this incident, the government served a grand jury subpoena on a witness with information about the shooting. The subpoena was delivered to the office of a lawyer who had previously identified himself as the witness's lawyer. A short time after, Simpson called the witness, informed the witness in sum and substance that he was aware of the subpoena, and threatened the witness. The witness called 911 and police responded to the scene.

      vi.   Simpson's Possession and Use of Firearms

In addition to the firearm-related charges contained in S-2, the cellphone seized from Simpson on or about May 26, 2021, and searched pursuant to a judicially-authorized search warrant contains additional evidence of Simpson's use, possession, and brandishing of firearms. For example, on September 13, 2020, Simpson sent a message to which he attached an audio message, in which he explained that he "ain't no civilian in these streets, right. . . . I got beef in these streets, so . . . I know it's mad shit going on in these streets right now, so if I was coming, I was bringing my joint [i.e., gun]." On or about April 15, 2021, Simpson sent a message to which he attached a video file that shows him driving a car, smoking what appears to be marijuana, with a firearm in his lap. Screen shots from that video file are set forth below:

8

 

On or about April 28, 2021 Simpson sent an instant message to which he attached the following image, which appears to be a screenshot of a text message exchange with a phone number ending in 3353 that includes two photographs of firearms:



9

On April 29, 2021, Simpson sent an instant message to which he attached the following photograph of two semi-automatic handguns with what appear to be extended clips:



And on or about May 23, 2021, Simpson and Williams engaged a heated disagreement via audio messages — apparently occasioned by something one of them said to a woman — during which Williams acknowledged having called on Simpson in the past to "bring a grip," i.e. a firearm.

Further, Simpson was in possession of a handgun at the time of his arrest this morning. As agents attempted to execute the arrest warrant for Simpson at a location in New Jersey, Simpson fled from law enforcement. Agents chased after Simpson and apprehended him and, after a struggle, found a handgun with an extended ammunition clip on Simpson's person.

c. Simpson's Criminal History

Simpson was previously convicted by guilty plea on August 13, 2018 of Attempted Criminal Possession of a Weapon in the 3rd Degree, Loaded Firearm-Other than Person's Home, in violation of New York Penal Law § 265.03(3). Simpson's prior conviction arises out of a March 2017 incident in which Simpson fired shots at another individual following an apparent dispute over a girl; Simpson did not hit anyone in the incident. He was sentenced to a term of two years' imprisonment. Following his release, his parole was revoked on several occasions and his parole expired on or about April 20, 2021.

10

II.     Legal Standard

The court "shall order" a defendant detained if it finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). The government bears the burden of persuading the court by a preponderance of the evidence that the defendant is a flight risk or that he will obstruct or attempt to obstruct justice, or by clear and convincing evidence that the defendant is a danger to the community. United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001); United States v. Madoff, 586 F. Supp. 2d 240, 247 (S.D.N.Y. 2009). However, where there is probable cause to believe a defendant has violated 18 U.S.C. § 924(c) — as there is with respect to Simpson — there is a statutory presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(B). Even if a defendant can overcome that presumption, the special risk of dangerousness posed by defendants who have committed such crimes "remains a factor to be considered among those weighed by the district court." Mercedes, 254 F.3d at 436.

The government may proceed by proffer to establish facts relevant to a detention determination. United States v. Ferranti, 66 F.3d 540, 541 (2d Cir. 1995). Furthermore, "[t]he rules of evidence do not apply in a detention hearing." Id. at 542. As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross examination. Most proceed on proffers. See United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000). This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly in LaFontaine, 210 F.3d at 131). Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence. Id.

United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004).

Whether detention is sought on the basis of flight or dangerousness, the Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, "including whether the offense is a crime of violence . . . or involves a . . . firearm"; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including "whether, at the time of the current offense or arrest, the person was on probation [or] on parole"; and (4) the seriousness of the danger posed by the defendant's release. See 18 U.S.C. § 3142(g). Specifically, in evaluating dangerousness, courts consider not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant

11

might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

III. Argument

No bail package will protect the community from the danger posed by the defendants. As an initial matter, Simpson is charged with violating 18 U.S.C. § 924(c) in connection with the August 2021 shooting it the vicinity of 927 Dekalb Avenue — in which eight people were injured — and there is therefore a statutory presumption that Simpson cannot overcome that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(B). Further, each of the four factors set forth in Section 3142(g) militate in favor of both defendants' pretrial detention.

First, both defendants are charged with "crimes of violence" as that term is used in the Bail Reform Act and with crimes that "involve[] a . . . firearm". 18 U.S.C. § 3142(g)(1); cf., e.g., United States v. Watkins, 940 F.3d 152, 166 (2d Cir. 2019) (discussing § 3142(f)(1)(G) and explaining that, "by using the phrase 'that involves' in this subsection, Congress clearly intended for courts to pierce the veil of the charged offense and consider the conduct underlying the offense, including who was harmed and whether any firearms were used in the course of committing the offense."); see also, e.g., United States v. Persico, No. 10-CR-147 (DLI), 2017 WL 3669554, at *2 (E.D.N.Y. Aug. 23, 2017) (finding that conspiracy to commit extortion is crime of violence under Bail Reform Act and noting that, in this context, "conspiracy to commit a crime of violence is, itself, a crime of violence"). Simpson and Warren are both charged with racketeering conspiracy based on, among other things, predicate "acts involving murder chargeable under the New York Penal Law and punishable by imprisonment for more than one year," including attempted murder (Simpson) and murder conspiracy (Simpson and Warren); both are charged in murder conspiracies in-aid-of racketeering, and Simpson is additionally charged with attempted murder and assault with a deadly weapon in-aid-of racketeering in connection with the August 2021 shooting in the vicinity of 927 Dekalb Avenue. The violent conduct with which Simpson and Warren, together with others, are charged was coordinated, spanned many years, and is on its face, incredibly serious, strongly weighing in favor of detention. See United States v. Williams, No. 20-CR-293 (WFK), 2020 WL 4719982, at *2 (E.D.N.Y. Aug. 13, 2020) (holding magistrate judge erred in releasing on bail defendant who possessed a firearm in connection with a shooting).

The members of Bamalife, Simpson and Warren included, also pose a risk to the safety of victims and witnesses. See 18 U.S.C. §§ 3142(g) (the court must consider the "safety of any other person"), 3142(f)(2)(B) (providing that the government may move for detention because of "a serious risk that such person will . . . threaten, injure, or intimidate, . . . a prospective witness or juror). As discussed above, that concern is founded in Simpson's past conduct. Following the shooting at 927 Dekalb Avenue, Simpson was informed that a witness

12

had received a grand jury subpoena related to the shooting. In response, Simpson called and threatened the witness. See Madoff, 586 F. Supp. 2d at 247.

Furthermore, as set forth above, both defendants have engaged in acts of fraud that have victimized innocent people. So, although Bamalife's violent conduct likely poses the greatest danger to the community, the Court should also consider Simpson's and Warren's history of fraud in assessing their danger to the community. See United States v. DiSano, No. 18-CR-337 (WFK), 2018 WL 11191538, at *2 (E.D.N.Y. Dec. 14, 2018) ("Defendants pose a danger to the community not only when they commit acts of violence, but also when it is likely they will commit non-violent acts that are detrimental to the community."). As set forth above Warren, Williams and Simpson have access to PII and no compunction about using that information to benefit themselves. See, e.g., United States v. Berkun, 392 F. App'x 901, at *1 (2d Cir. 2010) (noting that detention was warranted in light of "substantial damage to individuals" caused by fraud, together with other factors).

Second, the weight of the evidence against Simpson and Warren is strong and this factor, too, weighs in favor of detention. Through the judicially-authorized seizure and search of electronic devices and social media accounts, together with witness testimony, and surveillance videos, the government has amassed overwhelming evidence that Simpson, Warren and their codefendants are members of the Bamalife enterprise, and that each member of the conspiracy agreed that members would commit acts of violence, including acts involving murder, in furtherance of the enterprise. As the Superseding Indictment makes clear, members of the enterprise have committed numerous shootings during the charged period, leaving 12 people — including innocent bystanders — seriously injured. Further, as described above, the 2014 shooting at 2255 Pitkin Avenue and the 2021 shooting in the vicinity of 927 Dekalb Avenue are captured on surveillance video and the evidence that Simpson personally engaged in acts of violence on behalf of the gang is strong. Similarly, there is overwhelming objective evidence that Warren personally committed predicate acts of fraud in connection with his membership in the enterprise and, together with witness testimony, equally strong evidence that he conspired with other members to commit acts violence, including to murder and assault John Doe 1, in retribution for being shot himself.

Warren's participation in Bamalife's violent conspiracies is reflected in his social media. The "Dying Together" video described above is one such example. In another, after Sutton was arrested on federal charges, Warren posted the following images to his Instagram account, showing Sutton shooting one of his victims and declaring "MY BOY GREAT":[6]

---

[6] The images in Warren's post below show Sutton shooting a victim of one of the shootings identified in the Superseding Indictment. The images were included in the government's memorandum in support of Sutton's pre-trial detention, and thereafter published in the press.

13



   In addition, Simpson faces a mandatory minimum sentence of at least 10 years' imprisonment and a maximum potential sentence of life imprisonment; Warren faces a mandatory minimum sentence of two years' imprisonment and a likely Guidelines range of at least 135-168 months' imprisonment if convicted of all counts at trial. The likelihood of a lengthy term of imprisonment for each defendant gives the defendants a strong incentive to flee. See Williams, 2020 WL 4719982, at *2 (Guidelines range of "92 to 115 months' imprisonment" gave defendant "a strong incentive to flee"); United States v. Bruno, 89 F. Supp. 3d 425, 431 (E.D.N.Y. 2015) (Kuntz, J.) ("When evidence of a defendant's guilt is strong, and when the sentence of imprisonment upon conviction is likely to be long a defendant has stronger motives to flee.").[7]

---

[7]  See also, e.g., United States v. Scali, 738 F. App'x 32, 33 (2d Cir. 2018) ("The court reasonably determined that [defendant's] Guidelines range of 87-108 months' imprisonment was significant enough to provide an incentive to flee"); United States v. Blanco, 570 F. App'x 76, 77 (2d Cir. 2014) (affirming district court's order of detention because, inter alia, defendant "face[d] a mandatory minimum prison sentence of five years, a possible maximum sentence of 40 years").

14

Third, the defendants' history and characteristics weigh heavily in favor of detention. Through the conduct charged in the Superseding Indictment and described above, Simpson, Warren and their fellow Bamalife members have shown a total disregard for the lives of others and the law. As described above, Simpson and Warren have bragged openly on social media and elsewhere about acts of violence committed by the Bamalife enterprise, they have conspired to murder members of rival gangs, and Simpson participated in a horrific shooting in which eight individuals were injured. Simpson's prior arrest for a shooting, and his subsequent jail term, has not dissuaded him from engaging in violent criminal conduct in connection with his gang membership; nor have other Bamalife members' terms of imprisonment dissuaded Warren from engaging in a life of criminal activity. See, e.g., United States v. Estevez, No. 18-CR-669 (JPO), 2020 WL 1911207, at *1 (S.D.N.Y. Apr. 20, 2020) (detaining defendant based in part on "the evidence of Defendant's active involvement in a violent gang, and . . . the evidence of Defendant's involvement in firearms offenses").

Fourth, the risk of further violence and flight by the defendants is severe. Courts have consistently held that where a defendant is associated with a violent criminal organization, no conditions — even stringent conditions of home confinement — are sufficient to protect the community. See United States v. Irizzary, No. 17-CR-283 (LAP), 2020 WL 1705424, at *3 (S.D.N.Y. Apr. 8, 2020) ("Even under normal conditions, electronic monitoring does not suffice to restrain violent criminals who, like [the defendant], are members of organized gangs."); Choudhry, 941 F. Supp. 2d at 359 ("It is well established that home detention and electronic monitoring may be insufficient to protect the community against dangerous individuals, particularly where those individuals have the ability to command others to do their bidding.").[8] This concern is exacerbated in light of the circumstances of Simpson's arrest this morning, at which time he was found with a handgun with an extended clip on his person. Moreover, the defendants' access to PII, their willingness to falsify financial and other information and their lack of legitimate employment or other ties to the community enhances the already significant risk that the defendants will flee pending trial. See, e.g., United States v. Carroll, No. 20-CR-360 (GTS), 2020 WL 7409028, at *2 (N.D.N.Y. Dec. 16, 2020) (denying release and considering, inter alia, defendant's "participat[ion] in device fraud and identity theft and fraud based upon his usage of others' names and past usage of fraudulent identification cards"); United States v. Gumora, 454 F. Supp. 3d 280, 290 (S.D.N.Y. 2020) (denying bail and considering, inter alia, the defendant's "conviction for identity theft" and "conviction for possession of a forged instrument"); cf. United States v. Hollender, 162 F. Supp. 2d 261, 269 (S.D.N.Y. 2001) (denying bail and explaining that "[t]his Court cannot overemphasize its concern about the possibility that a person skilled in identity theft and the

---

[8] See also United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology"); accord United States v. Brennerman, 705 F. App'x 13, 16 (2d Cir. 2017); United States v. Dono, 275 F. App'x 35, 37 (2d Cir. 2008); United States v. Kelly, No. 19-CR-286 (AMD), 2020 WL 2528922, at *3 (E.D.N.Y. May 15, 2020) ("Nor are the defendant's proposed measures—that he be kept on home confinement and monitored by pretrial services—sufficient to eliminate the danger to the community.").

15

creation of forged documents using a computer may employ that skill to facilitate flight (or to commit additional frauds).").

IV. Conclusion

For the reasons set forth above, the government respectfully submits that no condition or combination of conditions will properly assure the safety of the community or the defendants' return to court if they is released on bail, and therefore requests that the Court order that the defendants be detained pending trial.

Respectfully submitted,

BREON PEACE
United States Attorney

By: /s/
Kevin Trowel
Nick M. Axelrod
Assistant U.S. Attorneys
(718) 254-7000

cc: Clerk of the Court (by ECF)